**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

MITSEY MILLER,

        Plaintiff,

vs.

NANCY A. BERRYHILL,
Commissioner of the Social Security
Administration,

        Defendant.

:  Case No. 3:16-cv-00094
:
:  Magistrate Judge Sharon L. Ovington
:  (By full consent of the parties)
:
:
:
:
:
:
:

---

**DECISION AND ENTRY**

---

## I.    Introduction

Plaintiff Mitsey Miller worked most recently for 14 years as a quality control
supervisor in a plastics factory. In the spring of 2012 she ruptured her left Achilles
tendon, a painful sounding and, in reality, a debilitating injury that required surgery.
Over the years before and after her surgery, she experienced other health problems—for
example, difficulty healing from her Achilles-tendon surgery, obesity, rotator cuff tears,
cellulitis, acute bronchitis, and depression. She eventually concluded in late 2012 that
she could no longer work due to the combination of her health problems. In November
2012, she applied for Disability Insurance Benefits. Her work-precluding disabilities
began, she asserted, on the day she ruptured her left Achilles tendon—May 22, 2012.

Social Security Administrative Law Judge (ALJ) Gregory G. Kenyon determined that Plaintiff's health problems did not constitute a "disability" as defined by the Social Security Act.  He therefore denied her application benefits.

Plaintiff brings the present case challenging ALJ Kenyon's decision raising two main contentions:  (1) he failed to properly evaluate the opinions provided by certain physicians, and (2) he erred in not finding Plaintiff credible.  Plaintiff asks this Court to reverse the ALJ's decision and award benefits to her.  The Commissioner concludes that an Order affirming the ALJ's decision is warranted because there is no error in ALJ's decision and substantial evidence supports his findings.

**II.     Background**

On Plaintiff's asserted disability onset date, May 22, 2012, she was 45 years old.  This placed her in the category of a "younger person" under social security law.  20 C.F.R. § 404.1563(c).  She has a high school education.

Plaintiff's earnings record reveal that she began working in 1986 and continued to do so through 1991.  (Doc. #6, *PageID* # 232).  Her earnings zeroed out in 1992 and 1993.  She regained employment in all four quarters of 1994 and continued to work throughout each ensuing year, with the sole exception of one quarter in 1998.  Perhaps most notable is the fact that she remained employed throughout 2001 even though she underwent hip-replacement surgery due to Perthes' disease, which she had endured since

childhood.[1]  *Id.* at 108.  And, she thereafter continued to work until her asserted disability onset date (again, May 22, 2012).

Plaintiff has a history of additional orthopedic problems.  She testified during her hearing before ALJ Kenyon that despite those problems and her surgeries, she had always been able to return to work.  (Doc. #6, PageID #107).  That is, until her Achilles tendon ruptured.  When that occurred, her new combination of impairments put an end to her ability to work.  *Id.*

In addition to her ruptured left Achilles tendon, an examination in late May 2012 revealed osteoarthritis in her left knee and synovitis in her left knee.  Her Body Mass Index (BMI) was 43.76 (5′10″ 305 lbs.).  This placed her at Level III obesity.  *Id.* at 481. "Level III, termed extreme obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40."  Soc. Sec. Ruling 02-01p, 2000WL 628049, *3 (Sept. 12, 2002).

Plaintiff's recovery from her Achilles-tendon surgery was complicated by infection serious enough to require additional surgery and hospitalization for 11 days in August 2012.  Her surgery involved harvesting skin from her forearm and using it to cover her ankle wound.  She developed cellulitis in the harvested skin, but it was resolved by the time she was discharged from the hospital.  (Doc. #6, *PageID* #367).  However, in September 2012, she needed "aggressive debridement" of her left-Achilles region, which

---

[1] Perthes' disease is "a childhood condition in the hip where the femur and the pelvis meet in a ball-and-socket joint."  http://www.mayoclinic.org/diseases-conditions/legg-calve-perthes-disease/basics/definition/con-20035572.

exposed "necrotic material … consistent with pieces of nonviable Achilles tendon…." *Id*. at 462. One month later, her infection was resolved and her wound was significantly improved. *Id*. at 456. Physicians, however, kept a close eye on her wound over the following months, if not years. Indeed, the administrative record contains evidence of this close monitoring that post-dates the ALJ's July 2014 decision. For example, in October 2014, plastic surgeon Dr. Michael R. Johnson performed surgery on Plaintiff's left foot. He diagnosed her (both before and after surgery) with "Acquired deformity of left foot." *Id*. at 794. This, however, gets too far ahead of earlier significant evidence, such as information provided by Plaintiff's treating physician, Dr. Jueng Ahn.

In late December 2012, Dr. Ahn reported in that he had treated Plaintiff for over 20 years and last saw her on October 30, 2012. He noted that she had experienced an Achilles tendon rupture and that she used a walker. He observed that her left ankle was "severely deformed." *Id*. at 472. The administrative record also contains Dr. Ahn's notes concerning Plaintiff's treatment on 3 days (11-11-11; 10-30-12; and 1-21-13). *Id*. at 642-43. He listed, on January 21, 2013, Plaintiff's diagnostic impressions as rotator cuff tear and right carpal tunnel syndrome. She had an EMG and a Nerve Conduction Study in January 2013 that suggested "severe bilateral carpal tunnel syndrome." *Id.* at 585.

Plaintiff's treating surgeon Dr. Homayoun Mesghali operated on her in February 2013. He repaired the tear in her right rotator cuff and performed right tunnel release surgery. *Id*. at 629, 646-48.

In April 2013, Plaintiff had a left-shoulder MRI, which revealed, among other problems, "partial-thickness undersurface tearing of the anterior supraspinatus tendon

4

….” *Id*. at 610.  One month later, Dr. Mesghali's examination showed that she had full range of motion in both her shoulders, mild discomfort in her right shoulder during an impingement test, positive-impingement test on her left shoulder, tenderness over her left AC joint with good strength.  *Id*. at 624.  He reported she was 5′10″ tall and weighed 358 pounds.  *Id*. at 635.  This placed her BMI at 50.22, again Level III, extreme obesity.  *Id*.; *see* Soc. Sec. R. 02-01p, 2000WL 628049, *3.  Dr. Mesghali recommended arthroscopic surgery for her left shoulder.  (Doc. #6, *PageID* #636).  In August 2013, Dr. Mesghali saw Plaintiff and reported that she had undergone left-shoulder surgery.

In September 2013, Dr. Mesghali explained, with a flair for stream-of-consciousness writing and minimalist punctuation:

> This patient is status post multiple orthopedic surgeries the last one was the shoulder surgery she states that she tripped falling the left leg is giving away.  She is about 298, she had repair of the Achilles tendon left side, the head of the left showed bilateral carpal tunnel release.  She has tendonitis of the right elbow, 3 days ago she fell and injured the left elbow she has fairly good range of motion but she has some tenderness over the olecranon but no swelling no neurological deficit in the upper extremities she has some numbness and paresthesia in the left lower extremity she had repair of the Achilles tendon and also she had multiple skin coverage surgery.
>
> Physical examination,
>   She has good range of motion of the shoulder she can hold it against gravity and resistance she has difficulty reaching her back surgery is healing well and most likely has some tendinitis traumatic in nature, Examination of the left ankle good plantar flexion and dorsiflexion circulation is good, plastic surgery healing nicely.
>
> Recommendation,
>   This patient needs neurological examination for the left ankle, she states for some time she does not need the skin, she stated that she falls frequently ***In my opinion and that all of these orthopedic problems and obesity this patient would benefit of some type of permanent partial or total disability***….

5

I have seen in the office on when necessary basis.

*Id*. at 651 (emphasis added).  (This lengthy verbatim quote eschews use of "sic" or brackets.)

Dr. Linda Hall reviewed the record for the state agency in January 2013. She concluded that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds.  In an 8-hour workday, she could stand/walk for 2 hours and sit for 6 hours.  *Id*. at 124-25.  Dr. Hall opined that Plaintiff was limited in her ability to push/pull by her left-lower extremities; she could occasionally climb ramps and stairs; she could never climb ladders, ropes, and scaffolds; and she could occasionally balance, kneel, crouch and crawl.  Her ability to bend was unlimited. Her ability to reach overhead was limited by her right arm.  Her ability to handle, finger, and feel was unlimited.  *Id*. at 126.  She had to avoid all exposure to work hazards.

Dr. Elaine Lewis, another non-examining physician, reviewed the record on August 19, 2013, at the request of the state agency.  Her findings were the same as Dr. Hall's except she found that Plaintiff needed to avoid concentrated exposure to extreme cold and heat, and avoid concentrated exposure to wetness, as well as avoid all exposure to hazards.  *Id*. at 141-43.

Plaintiff testified during her administrative hearing in May 2014 that she was about 5′10″ tall and weighed about 358 (again, Level III obesity).  She explained, "since my surgery done on my foot [her Achilles-tendon surgery] I've been—I can't even hardly take care of myself anymore…."  *Id*. at 88.  At times

6

she has very sharp pain—"like a lightning bolt"—in her left foot, which also burns and stings near her surgical scar. *Id.* at 93-94. On a scale of 0 (no pain) to 10 (most intense pain), she experiences pain at level 4 during an average day. At times, her pain will rise to level 9; the lowest it gets is level 3. *Id.* at 94. Her foot also stays swells up, so she elevates it above the level of her heart 2 or 3 times each day. Also, her legs "give out." *Id.* Even just standing still, she sometimes falls. As a result, and at the direction of a physician, she constantly uses a cane. *Id.* at 96.

Lying in bed hurts her shoulders too much, so she spends much of her days sitting in a recliner with her left foot elevated on a pillow. She has a lot of shoulder pain when she tries to lift her arms above her shoulders or behind her back. She explained, "My shoulder … constantly aches, like a toothache-type thing. And I have sharp pain going through there too. And, like I said, if I [lie] down, it irritates it even more. So … I've been sleeping in a recliner for almost a year because of that." *Id.* at 97-98. Her carpal-tunnel surgery took care of the pain in her hands, although she still experienced a little pain in them once in a while. Her hands are constantly swelled up. She can't open jars. Her engagement ring and wedding band no longer fit. She can type but only for about 20 minutes, then her hands will "lock up …." *Id.* at 100. She has trouble gripping things; she constantly drops coffee cups.

Plaintiff's physical problems have also caused her to experience psychological difficulties—namely, depression. She testified that she has crying spells once or twice a

7

week, and she sometimes cannot get out of bed because her depression was so bad. Once, she could not get out of bed for a week.  She has difficulty concentrating and remembering things, and it is difficult for her to leave her house.  The only times she leaves her house is to see her counselor or physicians.  She combines this with trips to the grocery store, so she only leaves her house once a week or once every other week.  She takes an antidepressant (Celexa), which helps a little bit.  She sleeps 13 to 14 hours a day and can't function without this much sleep.  *Id*. at 100-03.

Medical records show that Plaintiff began mental health treatment in September 2013.  *Id*. at 689-705.  Treatment notes indicate that several months later, and again in April 2014, she'd made limited progress.  *Id*. at 662, 709.

Psychologist, Dr. Caroline Lewis reviewed the medical record in March 2013 at the request of the state agency.  She opined that Plaintiff had moderate restriction in her daily activities, moderate restriction in her social functioning, and moderate restriction in her concentration, persistence, or pace.  *Id*. at 123.  She further found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday or workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, to respond appropriately to changes in the work setting.  *Id*. at 127-28.  In

8

August 2013, psychologist Dr. Karla Voyten reviewed the record and agreed with Dr. Lewis's opinions. *Id*. at 139-40, 142-45.

### III.    ALJ Kenyon's Decision

Plaintiff's eligibility for Disability Insurance Benefit turned on whether she was under a "disability" as defined by social security law. *See* 42 U.S.C. § 423(d)(1)(A)-(d)(2)(A); *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). To resolve this issue, ALJ Kenyon evaluated the evidence under the Social Security Administration's 5-step evaluation procedure. 20 C.F.R. § 404.1520(a)(4). Moving through step 1, the ALJ found at steps 2 and 3 that Plaintiff's impairments—including her severe impairments of "residuals of left Achilles tendon rupture degenerative joint disease of the shoulders, residuals of carpal tunnel release surgery, depression, an anxiety disorder, and a history of polysubstance abuse"— did not automatically entitle her to benefits. (Doc. #8, *PageID* #s 85-86).

At step 4, ALJ Kenyon found that the most Plaintiff could do despite her impairments—her residual functional capacity, *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002)—was sedentary work with many limitations:

1) Occasional crawling, crouching, kneeling, stooping, balancing, and climbing of ramps and stairs;

2) No climbing ladders, ropes, or scaffolds;

3) No work around hazards such as unprotected heights or dangerous machinery;

4) Occasional use of the upper extremities for overhead reaching;

9

5) No use of the left lower extremity for pushing, pulling, or operating foot controls;

6) Frequent use of the upper extremities for handling and fingering;

7) Limited to performing unskilled, simple, repetitive tasks;

8) Occasional contact with co-workers, supervisors, and the public;

9) No jobs involving fast paced production work or strict production quotas; and

10) Limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next.

(Doc. #6, *PageID* #69).

Given these abilities and limitations, plus Plaintiff's younger age, her high-school education, and her work experience, the ALJ found (step 4) that she could not perform any of her past jobs but could perform a significant number of jobs in the regional and national economies (step 5). These doable jobs, according to the ALJ, included Inspector, Document Preparer, and Type Copy Examiner. This step-5 finding dictated the ALJ's final determinations that she was not under a disability and not eligible for benefits. *Id*. at 75-76.

## IV.    Analysis

Judicial review of the ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings. *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 405 (6th Cir. 2009). "The substantial-evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Id.* at 406 (internal quotation marks

10

omitted). As long as substantial evidence supports the ALJ's decision, his or her findings are accepted "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (citations omitted).

A. **Medical Evidence**

Plaintiff contends that the ALJ erred by failing to provide good reasons for rejecting Dr. Mesghali's opinion and by relying on certain evidence, including the evaluations of Dr. Johnson and Dr. Mancho, and Dr. Mesghali himself, to reject Dr. Mesghali's opinion. Plaintiff further contends that the ALJ erred by relying on the opinions provided by state agency medical and psychological consultants because he failed to provide any analysis of their opinions and did not consider any of the factors applicable to their opinions. The Commissioner maintains that the ALJ permissibly assigned "little weight" to Dr. Mesghali's opinion and properly relied on the opinions provided by state agency medical sources, Drs. Hall and Lewis.

Social Security regulations require ALJs to give the opinion provided by a treating physician controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). "Even if [a] treating physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the opinion…is entitled to great deference." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (internal quotations and citations omitted). This rebuttable presumption requires ALJs to continue weighing treating source opinions under certain

11

factors: the length of the treatment relationship, frequency of examination, specialization of the treating source, supportability of the opinion, and consistency of the opinion with the record as a whole. 20 C.F.R. §§ 404.927(c)(1)-(6); *see Bowen*, 478 F.3d at 747.

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions by stating "specific reasons for the weight placed on a treating source's medical opinions …." *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting Soc. Sec. R. 96-2p, 1996 WL 374188 at *5 (1996)). The ALJ's reasons must be "supported by the evidence in the case record …." *Id*. The goals are to assist the claimant in understanding the disposition of his or her case and to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.*

The ALJ found Dr. Mesghali's opinion deserving of little weight because it is conclusory and unsupported by the evaluations of other medical sources (Drs. Johnson and Mancho), including "Dr. Mesghali himself who reported good results of all surgeries complicated only by a fall where she reinjured her left shoulder…." (Doc. #6, *PageID* #s 72-73).

The ALJ did not specifically refer to the treating physician rule or its legal criteria. Instead, the ALJ viewed Dr. Mesghali's opinion under the legal criteria (supportability, consistency, etc.) applicable to non-treating medical sources. This constitutes a failure to apply the correct legal criteria, assuming Dr. Mesghali is a treating source as defined by social security regulations. *See* 20 C.F.R. § 404.1502; *see also Gayheart*, 710 F.3d at 375 ("[t]he regulations provide progressively more rigorous tests for weighing opinions as the

12

ties between the source of the opinion and the individual become weaker." (citation omitted)).  The Commissioner, moreover, does not challenge Dr. Mesghali's status as a treating medical source.  This is commendable given the continuous treatment Dr. Mesghali provided Plaintiff beginning with her Achilles-tendon surgery in May 2012 through follow-ups until December 2013, at least.  *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (finding doctor met definition of treating physician by performing surgery and developing extensive treatment relationship spanning over one year.)

Perhaps the ALJ did not consider Dr. Mesghali to be a treating physician as defined by social security regulation.  *See* 20 C.F.R. § 404.1502; *see also Blakley*, 581 F.3d at 407.  If so, he needed to say so as the starting point of his evaluation of the medical source opinions because (again) different legal criteria applies to treating medical sources versus examining or record-reviewing sources.  *See Gayheart*, 710 F.3d at 375; *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("[SSA] recognizes that not all medical sources need be treated equally, classifying acceptable medical sources into three types: nonexamining sources, nontreating (but examining) sources, and treating sources.").  The ALJ's omission robs his decision of a foundational inquiry:  Was Dr. Mesghali a treating physician?  Given this omission and the ALJ's decision to not discuss or apply the treating physician rule, the ALJ failed to provide of "good reasons" for placing little weight on Dr. Mesghali's opinion.  *See Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011) (the good-reasons mandate "is intended 'to let claimants understand the disposition of their cases, particularly in situations where a

13

claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not.'" (quoting, in part, *Wilson,* 378 F.3d at 544)).

The Commissioner contends that the ALJ properly discounted Dr. Mesghali's opinions by relying on both the available medical evidence and the opinions of state agency physicians, Drs. Hall and Lewis. (Doc. #6, *PageID* #826). This contention lacks merit. The ALJ relied on Dr. Hall's and Dr. Lewis's opinions without weighing their opinions under any of the applicable factors required by the regulations. This is another version of a failure to apply the correct legal criteria—this time to non-treating, record-reviewers' opinions. *See Miller v. Comm'r of Soc. Sec*, 811 F.3d 825, 836-37 (6th Cir. 2016); *see* 20 C.F.R. § 404.1527(e)(2)(ii) (mandating ALJs to evaluate state agency medical source opinions under the regulatory factors); *see also* Soc. Sec. R. 96-6p, 1996 WL 374180, *2-*3 (July 2, 1996). And, this error gives birth to yet another error: The ALJ applied greater scrutiny to treating specialist (surgeon) Dr. Mesghali's opinions than he did to the opinions by nontreating sources, Drs. Hall and Lewis. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379. Given these errors, the Commissioner's attempt to find solace in the ALJ's reliance on Drs. Hall and Lewis as a basis for discounting Dr. Mesghali falls short.

On a separate yet related point, the ALJ merely acknowledges that Plaintiff "stands 70 inches tall and weighs 358 pounds." (Doc. #6, *PageID* #70). Nowhere does the ALJ refer to Plaintiff's extreme Level III obesity or indicate that he considered the

14

impact Plaintiff's Level III obesity has, either alone or in combination with her other impairments, on her ability to perform work activities.  This fails to comply with a mandatory requirement set forth in the regulations, which explain:

> The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must consider* any additional and cumulative effects of obesity.

20 C.F.R. Part 404, Subpart P, App'x 1, § 1.00(Q) (emphasis added); *see* Soc. Sec. R. 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002).  In one circumstance, an ALJ's decision that does not consider obesity might not be faulted.  "The ALJ satisfies this requirement so long as she credits 'RFCs [residual functional capacities] from physicians who explicitly accounted for [the claimant's] obesity.'"  *Miller*, 811 F.3d at 835.  Yet, it is equally accurate to recognize (as *Miller* does) that obesity "must be considered throughout the ALJ's determinations, 'including when assessing an individual's residual functional capacity,' precisely because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015); *see Miller*, 811 F.3d at 835 (citing and quoting *Shilo* parenthetically).

In the present case, Drs. Hall and Lewis considered Plaintiff's obesity when assessing her residual functional capacity.  (Doc. #6, *PageID* #s 125, 143).  But, this does not ameliorate the ALJ's failure to consider Plaintiff's obesity at steps 2, 3, and 4 due to the ALJ's errors (discussed above) in accepting the opinions of Drs. Hall and Lewis.

Additionally, Dr. Mesghali considered Plaintiff's obesity combined "with all of [her] orthopedic problems …," when forming his opinion. *Id.* at 651. The fact that Drs. Mesghali, Hall, and Lewis considered Plaintiff's obesity should have alerted the ALJ to address the impact Plaintiff's obesity, alone and in combination with her other impairments, had on her at steps 2, 3, and 4 of the sequential evaluation. *See Miller*, 811 F.3d at 835 ("The ALJ's limited discussion of Miller's obesity argument does not comply with SSR 02[-]1p and certainly casts additional doubt upon whether there exists substantial evidence to support the ALJ's finding that Miller is not disabled.")

The Commissioner also contends that the ALJ permissibly assigned little weight to Dr. Mesghali's opinion because "he did not complete a 'medical opinion.'" (Doc. #10, *PageID* #825. The Commissioner correctly recognizes that "[m]edical opinions are statements from … acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, prognosis, what you can still do despite [your] impairment(s), and your physical and mental restrictions." 20 C.F.R. § 404.1527(a)(2). Plaintiff counters that the ALJ did not use this as a reason to discount Dr. Mesghali's opinion. The specter of *post hoc* rationalization thus arises.

Unpublished social-security case law from the U.S. Court of Appeals for the Sixth Circuit disparages the Commissioner's use of *post hoc* rationalizations in support of an ALJ's decision: "'[T]his Court shall not 'accept *post hoc* rationalizations for agency action in lieu of [accurate] reasons and findings enunciated by the Board.'" *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 524 (6th Cir. 2014) (quoting *Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991)); *see Simpson v. Comm'r of Soc. Sec.*, 344 F.

App'x 181, 192 (6th Cir. 2009) (same).[2]  Yet, *Keeton* and other unpublished Sixth Circuit

cases temper this maxim:

> While agency decisions must be sustained, if at all, on their own
> reasoning, ... this principle "does not mechanically compel reversal 'when a
> mistake of the administrative body is one that clearly had no bearing on the
> procedure used or the substance of [the] decision reached.'"  Where a
> subsidiary finding is unfounded, the court will remand the case to the
> agency for further consideration only if "the court is in substantial doubt
> whether the administrative agency would have made the same ultimate
> finding with the erroneous finding removed from the picture...."

*Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792, at *7 (6th Cir. Sept. 16, 1993)

(citation omitted).  This, in substance, says that harmless error might apply when *post hoc*

rationalizations are raised in support of an ALJ's decision.  *See Keeton*, 583 F. App'x at

524; *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x. 463, 464 (6th Cir. 2007).  Similarly,

harmless error applies in other contexts, such as an ALJ's failure to provide good reasons

for the weight given to a treating source's medical opinions.  *Wilson*, 378 F.3d at 546-57.

The present discussion therefore arrives by hook or by crook or by case law at the

issue of whether the ALJ's errors were harmless.[3]  Harmless error might occur "if … 'a

treating source's opinion is so patently deficient that the Commissioner could not

---

[2] Published decisions in other Circuits align with this.  *E.g., Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir.
2010) (the Commissioner's attorney violated "the *Chenery* doctrine (*see SEC v. Chenery Corp.*, 318 U.S.
80, 87–88 (1943)), which forbids an agency's lawyers to defend the agency's decision on grounds that the
agency itself had not embraced."); *Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) (Posner, J.) ("We
are particularly concerned about the *Chenery* violations committed by the government because it is a
recurrent feature of the government's defense of denials of social security disability benefits, as this court
has noted repeatedly."); *Jones v. Astrue*, 647 F.3d 350, 356, (D.C. Cir. 2011) (rejecting Commissioner's
attempt to provide rationale when the ALJ provided none: "The treating physician rule requires an
explanation by the SSA, not the court."); *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) ("this
court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent
from the ALJ's decision itself."); *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir. 1999) ("A reviewing court
"may not accept appellate counsel's *post hoc* rationalizations for agency action.").

possibly credit it ….'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Wilson*, 378 F.3d at 547).

Review of Dr. Mesghali's disability opinion is not so patently deficient that the Commissioner could not possibly credit it. Certainly, Dr. Mesghali's disability opinion is not binding on the ALJ. *See* 20 C.F.R. § 404.1527(d). But, the fact that he expressed a disability is not a valid reason by itself for wholly rejecting it. "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' That's not the same thing as saying that such a statement is improper and therefore to be ignored …." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted). Additionally, although Dr. Mesghali expressed a succinct disability opinion, it was not a conclusory opinion, as the ALJ believed. Before Dr. Mesghali opined that Plaintiff "would benefit from some type of partial or permanent disability…," (Doc. #6, *PageID* #651), he based his opinion on the multiple orthopedic problems he discussed previously plus Plaintiff's obesity. (Doc. #6, *PageID* #651). The record, moreover, contains evidence consistent with Dr. Mesghali's opinion. Dr. Ahn, Plaintiff's treating physician reported in December 2012 that on exam, she walked with a walker and her left ankle was "severely deformed." *Id.* at 472. Plaintiff received physical therapy at Reid Rehab Center for her left ankle from November 5, 2012 through December 7, 2012. *Id.* at 535-66. The goal

---

[3] In non-alliterative language, the present discussion arrives by the Commissioner's *post hoc* rationalization or by unpublished cases or by published case law at the harmless-error issue.

was to enable her to walk with one crutch or a cane, have less pain, and have an increase in the mobility of her left ankle. Her goals were met at discharge. *Id*. at 535. It was noted that she had some leg length discrepancy owing to her hip replacement. *Id.* at 539. On December 7, 2012, Plaintiff still had a poor gait with a severe limp. *Id*. at 542. Dr. Johnson continued to treat her for her wound and on March 26, 2013, he observed that she had some hypertrophic scarring, moderate edema of the left leg, and tenderness of the posterior plantar fascia. *Id*. at 598. In May 2013, she had decreased sensation of her plantar on her left foot. *Id*. at 636. She was issued a handicap sticker for parking in June 2013. *Id*. at 637. Dr. Johnson saw Plaintiff on January 20, 2014 and he noted that she had a painful scar that was very bulky. He reported that she would undergo debulking surgery in the near future. *Id*. at 706.

Plaintiff also had a significant right knee impairment. In January 2013, Dr. Mesghali noted that she had osteoarthritis of the right knee. *Id*. at 626. On exam, she had pain, swelling, and crepitation. *Id*. at 627. X-ray of her right knee showed "osteoarthritis and narrowing of the joint most significant in the medial side of the joint, also patient has genu varus deformity." *Id*. at 632. In addition, she underwent a rotator cuff repair of her right shoulder and a right carpal tunnel release in February 2013. She also had problems with her left shoulder and left wrist with severe left carpal tunnel syndrome as well as a hip replacement and osteoarthritis of both knees. *Id.* at 632. On May 28, 2013, an exam showed some discomfort on impingement testing, positive impingement test on the left shoulder, tenderness of the left shoulder, positive Tinel sign and minimal thenar atrophy of the left wrist, and well-healed graft of her left ankle and decreased sensation of the

19

plantar aspect of the left foot. *Id*. at 634-35. She underwent a left shoulder medial arthroscopy, acromioplasty, repair of the left rotator cuff, and Mumford procedure and a left carpal tunnel release. Post-surgery of the left shoulder and left carpal tunnel release. *Id*. at 636, 658. These multiple surgeries and the need for a cane support Dr. Mesghali's opinion of disability. This evidence is sufficient to show that Dr. Mesghali's opinion was not so patently deficient that the ALJ's errors in reviewing this treating source's opinions were harmless.

Harmless error also might occur in two other situations: "'if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion'; or … 'where the Commissioner has met the goal of § 1527(d)(2) [presently, § 1527(c)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation.'" *Friend*, 375 F. App'x at 551 (quoting *Wilson*, 378 F.3d at 457). These situations are not present in this case. First, the ALJ did not make findings consistent with Dr. Mesghali's opinion, report, and records. Second, the ALJ's decision did not meet the goal of § 1527(c)(2) because in addition to the ALJ's failure to provide good reasons for rejecting Dr. Mesghali's opinions, the ALJ improperly credited the opinion of Drs. Hall and Lewis without weighing them as the regulations require, and because the ALJ failed to consider Plaintiff's obesity in combination with her other impairments.

Accordingly, the ALJ's errors were not harmless. *Cf. Cole*, 661 F.3d at 940 (finding no harmless error and noting that even though the Commissioner might reach the same result on remand in compliance with the treating physician rule, the plaintiff "will

then be able to understand the Commissioner's rationale and the procedure through which it was reached….").[4]

## B. Remand Is Warranted

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014); or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or

---

[4] In light of the problems in the ALJ's decision and the resulting need to remand, consideration of Plaintiff's challenge to the ALJ's credibility finding is unwarranted.

21

where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is lacking. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence 4 of § 405(g) due to problems set forth above. On remand the Social Security Administration will review Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying disability under the applicable 5-step sequential evaluation procedure, including, at a minimum, a re-evaluation of the medical source opinions, an assessment of Plaintiff's obesity and the combined effects of her obesity and other impairments at steps 2, 3, and 4 of the sequential evaluation, and a re-consideration of the evidence at steps 4 and 5 of the sequential evaluation.

**IT IS THEREFORE ORDERED THAT**:

1.      The ALJ's non-disability determination is vacated;

2.      No finding is made as to whether Plaintiff Mitsey Miller was under a "disability" within the meaning of the Social Security Act;

3.      This case is remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. §405(g) for further consideration consistent with this Decision and Entry; and

    4.      This case is terminated on the Court's docket.


March 16, 2017                                *s/SharonL. Ovington*
                                             Sharon L. Ovington
                                             United States Magistrate Judge